Good morning, Your Honor. My name is Richard Katz, and I represent Sussex Enterprises, Inc. I would like to reserve five minutes of my time for rebuttal. We're here today because it is our position that the District Court granted a motion for summary judgment on a case that Sussex did not file. It completely ignored the essence of the gravamen of Sussex's complaint when it issued its ruling. And by doing so, it kind of went off base and discussed elements that had nothing to do with what we were alleging in our fraud complaint. Secondly, the Court made a numerous factual errors. It ignored facts that were before it. It also stated in the record that there were no facts to support certain propositions when, in fact, there were facts in the record to support it. And finally, and probably most importantly, in determining many of the issues that the Court decided, it violated the basic rules of motions for summary judgment, i.e., it resolved conflicts in the evidence against the opposing party, i.e., Sussex. It failed to make reasonable inferences from evidence supported, I mean, excuse me, proposed by Sussex, and thereby effectively ignoring that evidence. And fourth, it ruled on issues in this case that had nothing to do with our case at all. And by that, I'm talking about what the IRS complained, but I'll get to that in a moment. I need to back up, though, to start this argument. The CARDS program was designed initially to provide two benefits for high net worth individuals. The first benefit was it allowed high net worth individuals with tied up assets, particularly restricted stock Silicon Valley executives, to allow them to monetize that tied up asset. It allowed them to get a loan that effectively paid no interest and no principal payments for 30 years, which was a unique quality of this program. The second benefit were there were potentially substantial tax benefits, but both were important. In making its decision in the district court, the court ignored the first benefit, i.e., the possibility of a long-term loan that provided what was effectively a zero-coupon loan, that is, no interest and no principal payments. When Mr. Hahn, who was the principal of Sussex, made the presentation to HVB, the respondent in this case, he made it clear to them that in order for these two unique benefits to come about, the bank had to intend to make a 30-year loan, at the same time having the ability to terminate the loan if it had a substantial reason for doing so or a commercial reason or economic reason. But that wasn't the language that ended up in the contract. I understand that, Your Honor, and I will address that in a minute. That, in fact, you raise one of the central issues in this case. That's exactly why there was fraud here. What the court did was it assumed that the loan agreement, that Sussex was a party to the loan agreement. It was not. And, in fact, later on in the decision, after it goes through the loan agreement, it says Sussex is not a party to the loan agreement. The problem is Sussex asked HVB to provide a loan with certain elements in it. And we claim that HVB agreed to do so. If it failed to provide that loan and intentionally failed to do so, that's the element of our fraud case. So if the loan agreement can be read as the court read it, that is, it doesn't provide for certain elements in it. When there was a promise to do so, that, we claim, is part of our fraud case. But, Your Honor, the element of having to have a commercial reason before they could terminate the loan is actually separate and apart from the main part of our case that they had to have the intention to begin with. Because even if you come to the conclusion that they didn't need a commercial reason, although we believe there's adequate proof that they had promised they would have one, you still have to come to the conclusion that the loan was a fraud because they didn't have the initial intent to make this 30-year loan, which would denude effectively or get rid of the two very benefits of the loan program. Because without having that intent, as Mr. Hahn had explained time and again both in papers that were given to HVB and orally, that intent allowed the taxpayer to amortize the high upfront costs of obtaining that loan, which were 4 to 7 percent. They amortized that over a period of 30 years. That extra cost comes down to about 0.23 percent. So that effectively meant that they would have a low enough interest rate on the loan which would allow them to invest that into some kind of an asset that would earn more money than a market rate loan would. I understand perfectly why you wanted this kind of loan, but the loan, that's not what you got with this loan according to its terms. You had a loan that they could terminate at its sole discretion. We never argued that they had the right to terminate that loan. So what in the document, just focus on the document, would cabin their exercise of discretion to terminate the loan? We're not arguing, well, the evidence in this case is that HVB intended to terminate the loan at the end of the first year before they even issued the loan. Yes, I understand. But they promised not to, if they don't have the initial intent to issue the 30-year loan and then later on change their mind, which they could do, we don't argue that, but they have to have that initial intent. And if they don't have that initial intent, then all of the benefits of the loan go away. The taxpayer cannot claim a tax loss. The taxpayer, the client borrower does not have an opportunity to have the zero-coupon loan long term. And no rational person would pay four to seven points up front for what effectively was a market rate loan and know in advance that that loan was going to be terminated at the end of the year. It's crazy. They would have been paying effectively between 11 and 12 percent for a 5 percent loan in those days for a one-year loan. So the problem is if this is the case. I know it doesn't make any sense, but still, if it ended up to be a bad deal, but it's a deal that conformed to the terms of the contract, explain to me why that's fraud. Okay. It was explained explicitly to HBB that you had to intend this 30-year loan, that you intended to keep it going for 30 years. You could change your mind afterwards, but you had to have this intent. The reason is without having a reasonable expectation of having a 30-year loan, the taxpayer could not legitimately claim, it could amortize those fees over 30 years. So it did away with it. So we're not arguing with the fact that they had the ability to terminate the loan later on. They just couldn't intend in advance to terminate the loan at the inception. In other words, they were going to terminate it at the end of one year. Because once they failed to have that or, excuse me, once they had that intent, it the whole purpose of the loan goes away. And there's nothing in the loan agreement, Your Honor, nothing that deals with the intent of the bank. In fact, if anything, it supports our position, because the loan agreement clearly says there's an expiry date 30 years hence, that it's going to be a 30-year loan, and they go through a whole series of paragraphs explaining how the interest rate will be reset each year. So any rational person reading that would at least believe they had a chance at a 30-year loan. But the truth is they never had a chance at a 30-year loan, because HVB decided at the beginning never to let this loan go beyond a year or so. That's the evidence in this case. So the document does not contradict our position in the case at all. If anything, it supports it, because it would lead a rational person reading that to believe that the bank, in fact, intended to have a 30-year loan. Why wouldn't it lead a rational person to say there was a substantial risk that the bank could terminate it after a year? I mean, that's a risk that was on the plain face of the document. And I realize you're – I understand your point, but there are many cases in which you have oral assurances to get into a business deal that don't pan out. And that's why we have the parole evidence rule. That's why we have the integration rule. We have all of these rules, because the written document controls. But, Your Honor, I'm sorry, but I'm maybe not making myself clear. It's not an issue that they could, and that was a risk. Everybody understood the risk. The risk they did not buy into was that the bank never intended to have the 30-year loan. That's the risk that they never accepted. But there's no – but there's no assurance even on the face of the document of the contract that the bank had to have an intent from the outset to issue a 30-year  It did issue a 30-year loan. And those terms could have been enforced over the course of 30 years. But the opt-out didn't contain any qualifying provision. And you could have contracted around this, for example, by requiring that an opt-out after one year be accompanied with a statement of good cause or something. That's true, Your Honor. They could have. They could have contracted around this, but you didn't. I understand that, Your Honor. But that's not the central core of our case. There's nothing in the contract. In fact, if the bank intended to terminate the loan at the end of the year, as is the evidence in this case says, and we have supports. Okay. Well, if they intended that and they didn't put that in the document, and of course they didn't put it in the document because there would be no reason to state the 30-year loan except to defraud the people getting the loan. In other words, if they intended at the end of the year to terminate that loan, it should have said in the contract, we're going to terminate this at the end of the year. And had they said that, nobody would have entered into this contract. So what they did is they wrote the contract to mislead anybody into thinking they had a chance at a 30-year loan. What we're saying is not that they had to keep the loan going for 30 years, but we had to have a chance at a 30-year loan. But there was never this chance at a 30-year loan because they never intended to go beyond a year. That's the essence of our case. And also I say again, the loan agreement, Sussex is not bound by the loan agreement. Sussex said it's – let me try and use an analogy here. Say from – by way of example, that you hire someone to cut your neighbor's trees, and they never intend to do it. They go over there and they actually mow the lawn. They take your money for cutting the trees. And they go to the neighbor and they say, would you sign an agreement here saying that I've performed the service as your neighbor wants to do for you, and he signs that agreement. Later on, you find out the guy didn't cut the trees and never intended to cut the trees. We're saying the bank never provided the loan agreement that we negotiated with them. We didn't sign the loan agreement. Sussex is not bound by that. There's nothing in the contract that bounds – Sussex's name is not even mentioned in the loan agreement. Nowhere is it mentioned in the loan agreement. So how are we even bound by its terms? That's not clear to me how that could possibly be. But what we're saying is you didn't provide the loan. You admitted you would. And in fact, the district court stated this exact principle correctly when it denied the second motion to dismiss. It said that it was reasonable for Sussex to believe, based on the DiGiorgio email, that while the bank could terminate the loan at the end of the year, that he could reasonably believe that there would, in fact, be a 30-year loan with an opportunity for it to go 30 years. That's the whole point. The opportunity for the 30-year loan disappeared at the beginning. And therefore, the – that's another thing. Let me go back to this. When you're interpreting an agreement, any agreement, the central issue you have to take into consideration is what was the clear intent of the parties, and you try and interpret the language in the agreement to support the clear intent of the parties. Well, the clear intent of the parties here was to, A, have a possibility or a chance at a 30-year loan, and, secondly, tax benefits. So if you interpret this agreement as saying the bank could initially intend not to continue the loan beyond a year, you completely vitiate the clear intent of the parties, that is, to give them this tax benefit and to give them the opportunity for a 30-year zero-coupon loan. So even when you interpret the contract, the only way the court's analysis of this makes any sense whatsoever is to say that everybody understood that the loan would be terminated after a year. And the evidence of that is to the contrary. And, in fact, if anybody had ever said that, it would have been illegal for the taxpayers to try and claim a tax loss because they could not legitimately say, we intended to amortize the cost of this loan, bring it down enough so we could invest in an asset that exceeded the amount of interest we were paying. So any analysis you do of this still gets back to the issue of whether the bank had that initial intent. There's not a single thing in the loan agreement that says we intend to terminate this loan, or we don't have the intent to go on for 30 years. So the loan agreement, as I said, I'm repeating myself, but it says we intend for this to be a 30-year loan. And anybody reading it would say, yeah, there's a possibility of getting a 30-year loan. They're willing to take the risk, Your Honor, of the fact that the bank could change its mind subsequently. But, in fact, there was evidence that the bank actually understood the agreement as we understood it in regard to having a commercial reason. And there's two pieces of evidence for this. In Mr. Hahn's declaration in support of its own motion for summary judgment, contrary to what the Court said, there's no evidence in his declaration there is, he reiterates a conversation he had with Mr. DiGiorgio where they discussed the basis upon which the bank could terminate the loan. And they used two examples, two commercial examples. If I might, Your Honor, I'd like to read from Mr. Hahn's declaration in that regard. Mr. Hahn's declaration in support of its own motion for summary judgment, contrary to what the Court said, there's no evidence in his declaration there is, he reiterates a conversation he had with Mr. DiGiorgio where they discussed the basis upon which the bank could terminate the loan. And there's no evidence in his declaration there is, he reiterates a conversation he had with Mr. DiGiorgio where they discussed the basis upon which the bank could terminate the loan. It said, that statement reflected a conversation we had concerning the circumstances under which the loan could be terminated sooner than 30 years. One of the scenarios contemplated was a refusal by an assuming party to accept the interest rate offered by the bank at any reset period. Such a refusal would obviously accelerate the maturity date. Other scenarios included significantly changed business dynamics of the borrower or bank. That's one piece of evidence. A second piece of evidence, and this is very important, is that in fact when the bank terminated the loan, Mr. DiGiorgio gave Mr. Hahn not one but two reasons, two valid commercial reasons for doing so. He had no reason to do that unless he thought he had an obligation to give a reason. Third piece of evidence was Mr. Groh's declaration, and the fourth was Mr. Braley's declaration, which is, I know, an issue in terms of whether it's admissible or not. But there are four pieces of evidence that the bank promised that it wouldn't terminate these loans except for a valid business reason. And the fifth piece of evidence, Your Honor, is that under California law, if anybody has a unilateral right under any agreement, it must exercise that right reasonably and fairly. And so, therefore, you can read into the contract a reasonable inference that they had to have a valid commercial reason. Well, that gets you to breach of covenant of good faith and fair dealing, but it doesn't get you to fraud. Well, we're not saying that the bank – the fraud issue is that they never had a reason. The fraud issue – No, I understand that. Okay. So what we're saying, that's the fraud issue. The fraud issue is that up front, they never were going to issue a loan that conformed with the intent of the parties or that they promised to give. And the trial court itself recognized that in the first motion to dismiss. I'll reserve my time because I want to have two minutes left. But if you read the motion to dismiss, the court recognizes that by reading that DiGiorgio email, Sussex had a reasonable belief that they would in fact issue a loan as promised, i.e., to allow all of the benefits to the taxpayer promised. That's in the court's own motion to dismiss. Very good. Thank you, Your Honor. Good morning. May it please the Court. Tom Dupree on behalf of Fiapoli HVB. Last December in its Reznor v. HVB opinion, this Court described Sussex, the appellant in this case. Thank you. This Court described Sussex as the engineer of the fraudulent cards tax shelter. And that description was apt. Sussex and its principal, Roy Hahn, designed, structured, marketed the fraudulent tax shelter, recruited lenders, five banks, of which HVB was the fifth, to fund the fraudulent tax shelter, then marketed and sold the tax shelter to its wealthy clients, reaping tens of millions of dollars in profits. When this whole enterprise came crashing down around Sussex, when the U.S. tax court declared it illegal, when the IRS declared it to be a fraud, Sussex did a 180 and had the audacity to sue HVB, claiming that it, Sussex, was a naïve in this process and had been defrauded by the bank that it had recruited to participate in the fraudulent scheme it designed. So we're not here for court of blame. We're here to discuss the theories and whether they fly on summary judgment. I understand your defense is that they were they didn't come in with clean hands, that they were part of the fraud and so forth. But isn't our review pretty narrow in this case? Well, I think it is narrow, Judge Thomas. But I think that these points do go to the ultimate question, because I think what those points illustrate is that Sussex knew full well what it was doing. It provided the credit agreement. At one point, my colleague mentioned that we or implied that we, HVB, had drafted this agreement. But that's not true. Sussex furnished this credit agreement to my client, which signed it. So it had drafted this. And the idea that they could argue to this Court that they were shocked, shocked when HVB terminated the loan in a year I think rings hollow, given that prior to HVB's involvement, they had 24 cards loans with other banks, 23 of which were terminated within a year or two. So if this 30-year provision was, in fact, an essential element of the transaction, as they now argue, one could reasonably ask, why wouldn't they have put that term into the contract when they gave it to us to sign? Twenty-three out of the 24 prior loans had terminated in a year. They're very sophisticated individuals. Mr. Hahn spent 34 years as an accountant for the nation's top accounting firms, exceedingly sophisticated parties that provided this contract, and yet they didn't include what they now say was an absolutely essential term. It simply doesn't fly. And so that's why, Judge Chavez, I was addressing the larger context. I understand the background is important to a certain extent. But on the other hand, much of this is these are disputed facts. And this is a summary judgment case. So it doesn't really come down to what the contract says and whether or not the parole evidence is admissible to modify the terms of the contract or explain it or whether there's fragile inducement. I agree, Your Honor. I agree that the parole evidence rule resolves this case. If it doesn't resolve this case, there are about three or four other reasons why summary judgment was correct. As far as the parole evidence rule goes, I think this is a classic case of a party impermissibly trying to modify a clear term of a fully integrated, unambiguous contract that it provided. What Sussex is arguing and — Judge Gould, if I could interject. Does the parole evidence rule prohibit someone who's not a party to a contract from introducing evidence inconsistent with the contract? I thought Sussex was saying that they're not really a party to the lending agreement. So does the parole evidence rule properly stop them from introducing evidence contrary to it? It does, Judge Gould. The site for that proposition is 18 Cal App 4th 77, a case called Kern County. Okay. It's a California case, obviously, in which the Court explains that the parole evidence rule does, in fact, apply to non-signatories to a contract, and it therefore prohibits exactly what Sussex is trying to do in this case. Thank you. I think it's undisputed that this is a fully integrated agreement. There is a merger and integration clause at the very end of this contract. I think as far as the question of ambiguity, I think the contract, as Your Honor's questions imply, is plain on its face. The contract confers an unambiguous right to HVB to terminate the contract within every year, one year from the signing of the agreement and at every one-year period thereafter. To be sure, the agreement could last for 30 years under the plain terms of the agreement. It's up to 30 years. But what it really is is it's a series of one-year agreements. In fact, HVB did not even need to take affirmative action to terminate the contract. The plain language of the contract provides that unless HVB affirmatively re-ups the contract for another year, the agreement terminates. The contract is plain and unambiguous on its face. The Eleventh Circuit in the Curtis Investment case, which we cite in our briefs, confronted this exact question, and it rejected the same argument that Sussex advances here, where they claim that HVB made an alleged oral misrepresentation that was ancillary to the written agreement. The Eleventh Circuit looked at the plain language of the contract and said you have a parole evidence problem. You also have a reliance problem, among other problems. But it said the language here is clear. HVB bargained for and received the right to terminate the agreement in one year. And, of course, it is not fraudulent to exercise a contractual right that is expressly granted to you by the written contract. Even if Sussex could somehow overcome their parole evidence problem, which I don't think they could, another flaw in their case is they simply don't have any evidence that HVB made a misrepresentation. At the end of his remarks, my colleague alluded to several pieces of evidence. In fact, their brief really focuses on three. The first piece of evidence that he says reflects a representation by my client is an e-mail from Dom DiGiorgio, who was an employee at the time of HVB. But that e-mail says nothing about HVB's intent to maintain the loan for 30 years. It says nothing about HVB's promise to keep the loan open for three years unless it had a valid commercial reason, whatever that might mean, for termination. In fact, all the e-mail says is it simply says, thank you for meeting with me. Here is what I understand the terms of the agreement to be based on what you said. And then it simply recites the maximum 30-year provision with the right to terminate after one year. And then it even says we're not saying we necessarily agree to any of this, but basically we're willing to discuss it on a going-forward basis. That's their only contemporaneous evidence in this case of the alleged misrepresentation. So even if this Court were inclined to dive into the extrinsic evidence, it doesn't get them where they need to go. The other two pieces of evidence they cite both postdate the filing of this lawsuit. And as the district court aptly noted, they're suffused with the taint of litigation. One of them is a declaration from Mr. Hahn, the principal of Sussex. But what's telling about this is that even in that declaration, he doesn't say that HVB made a misrepresentation to him. The most he can say is that HVB never disclosed its intent. But needless to say, that doesn't constitute an affirmative misrepresentation, which is the gravamen of their case. Even their principal, after he filed this lawsuit alleging a misrepresentation, couldn't say in his own declaration that HVB made an affirmative misrepresentation to him. The final piece of evidence that they cite, the third and last, is a declaration from Mr. Groves, who is an accountant, who claims that somebody at HVB told one of his unnamed colleagues that HVB would keep the loan open for 30 years unless it had a valid commercial reason for termination. But what's remarkable about this declaration is, number one, it's obviously several levels of hearsay. But more to the point, Mr. Groves doesn't say that he ever communicated this representation to Sussex. This is a third party. The alleged representation never even made it to Sussex. So it clearly can't support the claims that they're making here. The other two flaws in Sussex's case go to the question of reliance and the question of causation. As far as reliance goes, it's well-settled California law that a party cannot reasonably rely on an oral representation that is at odds with the express term of a written contract. That's exactly what we have here. And in making that determination, the California courts have emphasized that it is important to focus on the level of sophistication of the party claiming reliance. Here, of course, we have an exceedingly sophisticated financier who furnished the very contract. This is a classic case where even assuming there is a misrepresentation, any reliance would not have been reasonable because it's directly at odds with the express provision of the fully integrated contract. The final point, Your Honors, goes to causation and injury. They argue that they suffered injury in the form of having to pay millions of dollars in loan origination fees to HVB. Of course, this money came directly from their clients, who said, we'd like to participate in cards. Here is $14 million. Sussex, in turn, took that $14 million, gave $4 million of that to HVB, paid off the lawyer who's now in Federal prison and the British housewife who they used to staff their shell LLC, and kept the remainder. This is not an injury. The $4 million came directly from the clients. Mr. Hahn admitted in his deposition that he never refunded the money to his clients. They've never disgorged the money. So permitting them to recover this money would constitute a clear windfall to Sussex in that they would have been paid the money from their clients to participate. They would have been paid the money back from HVB and thereby obtained a double recovery. They simply have suffered no injury as a result of those loan origination fees. And their claim for attorney's fees is even weaker. Their argument there is that they have been forced to defend lawsuits as a result of HVB's allegedly wrongful conduct. Here, of course, there's absolutely no causal link. The IRS did not mention that the intent of the lender had any relevance to whether this was a fraudulent tax shelter, and it obviously doesn't. The Justice Department didn't say so either. They have absolutely no evidence establishing a causal link between HVB's allegedly undisclosed intent and the fact that they were sued by their clients for having persuaded them to participate in a fraudulent tax shelter. What made cards fraudulent was the basic design of the deal. It had nothing to do with the lender's intent at the time of the transaction, and therefore, they can't prove causation. The final point on causation is even if they could somehow establish but-for cause, they cannot establish proximate cause. In this Court's Resner decision from last year, it held that a client of cards could not establish proximate cause because the fraudulent acts were directed against the government rather than against participants in the scheme. And I think it follows a fortiori that if a client of cards cannot establish proximate cause, the actual mastermind, an engineer of cards, cannot establish proximate cause either. So for all those reasons, unless the Court has further questions, we respectfully submit that the judgment below be affirmed. Any questions? Okay. Thank you. Thank you. I realize the Court has said that the issue about this supposed abusive tax shelter is not relevant, but it is since they've raised it. All the evidence in this case was at the time that cards was entered into, with not just HVB but three other banks. Every single person that looked at it, every expert that looked at it, thought it was legal. HVB's internal tax department thought it was legal. Their outside counsel, Sherman Sterling, thought it was legal. Mr. Ted Wolf, one of the officers of HVB, said no one thought this was illegal. There's an internal email that we have presented in our brief where HVB says that if the IRS challenges cards, we are absolutely convinced that they will lose and the taxpayer will prevail. So this notion that cards as designed was an abusive tax shelter is bogus. And, in fact, there's only one, and you have to stretch the reasoning of the Court, there's only one Court that kind of implies it might be, and that's the Country Pine case. But if you look at that carefully, it's because, and what's interesting is, that Court deals with the same issue we dealt with, that is that they felt that the taxpayer itself did not have the proper intent to have a 30-year loan. So they really go off on the issue that we're claiming is the same here. Mr. Hahn is still sitting. He's been sitting in the courtroom today. He's never been charged with anything. He's never been prosecuted for anything. And if he had sold an abusive tax shelter, I guarantee that would happen. That's in evidence, too. So it's bogus to make that claim. I would like to state also that sole discretion doesn't mean no discretion. In other words, they could have a valid business reason, and in their own reasoning could terminate the loan. We don't argue with that. But they had to have a reason. But that doesn't even go to the issue of not having a reason to begin with. I state that again. The damage issue, I know I'm out of time. The damage issue, the $4 million, a windfall to the bank, not a windfall to Mr. Hahn. And, in fact, we cited lawsuits that were filed with specific complaints in there about not the IRS's position, but the position that HVB took in the Deferred Prosecution Agreement. The RLP complaint and the Kerner complaint, which is a Kermit complaint, pardon me, is attached to Mr. Hahn's declaration. Clearly, when we cited the paragraphs, that they're suing because of the bank's failure to have the initial intent to make a 30-year loan. It had nothing to do with the IRS. It doesn't even mention the IRS. It does a little bit, but it basically mentions the Deferred Prosecution Agreement and their failure to have the appropriate intent. So they're wrong about that. If the bank gets to keep this $4 million, effectively the district court's decision will be, you can defraud anybody you want to defraud of, and you get to keep the money. That's what happens here. All Mr. Hahn will be doing is getting his money back, not Hahn, but Sussex gets its money back for a product or a service that it never received. That's true of any case where someone defrauds you out of something. He would have had the money to maybe go to an appropriate bank. So he's not getting a windfall out of this at all. The Reznor argument is bogus also because in Reznor, the damages in Reznor, what Reznor was seeking was a return of the tax losses that it suffered. We're not seeking any tax loss here. We're seeking money we paid to another corporation. You're over time. Okay. And I granted you a little bit because I know you had a lot of ground to cover. I'm sorry. But I think if there are other points you need to make, you can supplement with the 20HA letter. Thank you, Your Honor. Thank you for your arguments. We will take a ten-minute recess at this point before hearing the last case on the calendar, and you'll let us know when everything's ready. Thank you. All rise.
judges: Thomas, Gould, Bybee